Proceeding with the first case, Berkshire Bank v. Lloyds Banking Group, et al. Good morning, Your Honors, and may it please the Court, I'm going to leave three minutes for rebuttal. Yes. Okay. Your Honor, plaintiffs contend that the District Court, for what is now the third time in these Government Development Bank's lawsuits. The issues on which they committed reversible error are both on the jurisdictional issues and both with respect to statute of limitations. With respect to jurisdiction, the law is clear that with respect to conspiracy jurisdiction under the standards set forth and reiterated in Schwab, a plaintiff must plead the existence of a conspiracy, that the defendant was a participant in the conspiracy, and that there were acts of furtherance of the conspiracy in the forum at issue. There is no doubt, and under Gilboa has confirmed, that there was an existence of a conspiracy, that the defendants, as far as the pleading matter goes, were participants in the conspiracy, and the record gives ample, ample evidence of acts of furtherance of the conspiracy in the forum state of New York. We have examples of the Charm Offensive by the BBA, whereby they sent out their secretary to convince the New York Fed that there was no false submissions with respect to LIBOR, there was no conspiracy. Excuse me, Mr. Lieberman, could you assume for a moment that we agree with you that as a constitutional matter, New York could assert in personam jurisdiction here under the conspiracy theory, and address whether New York has adopted that doctrine as a basis for a long-arm jurisdiction? With respect to long-arm statute, it's clear that if you commit a tortious act, if you are an agent, commit a tortious act in the forum jurisdiction in New York, then long-arm jurisdiction would apply. Yeah, but didn't we say, and I haven't traced this all the way back into New York law, in New York law, but didn't we say in Grove Press that New York's theory of agency requires that the principal exert control over the agent? Well, the New York statute, as a terrorist attack litigation makes clear, is either control or it's working on behalf of, or with the knowledge of. That's what it says in that case, but that's a Southern District of New York case, isn't it? That is a Southern District of New York case, it's not a Second Circuit case. It's not a Second Circuit case, and it's also, even our Second Circuit cases have to be predicting what the New York Court of Appeals would do. So aren't we mostly interested in the end of what the New York courts have said about this? Well, I mean, first of all, with respect to long-arm statute, that defense and that argument was waived on, it was waived at the court of law. Since we're already talking about the merits, I thought you'd start with the waiver argument. Yes, that's correct. I should have started with the waivers. But since you started talking about the merits, let's continue, and then I have a question to ask about the waiver argument. Sure. With respect to the statute, we have the statute, and as far as, and the statute says either through an agent or you committed tortious act yourself. Clearly of agency here, Judge Friendly has ruled that all co-conspirators are agents of one another. Whether you have, in a scenario where you have control, I think you have a very difficult situation where you have co-conspirators, any scenario, and one co-conspirator is acting, is controlling the other. Typically that's not how it works. Typically they are voluntary members of a conspiracy. Yeah, normally in a, so what you're saying is we apply normal conspiracy law, and a co-conspirator is ipso facto an agent. Yes. And therefore comes within 302 parens A, parens 2. That's correct. But obviously we don't even need to rely on that agency as a result of the knowledge that these acts are being committed in New York. You had a scenario where obviously the co-conspirators know that J.P. Morgan is suppressing LIBOR and manipulating LIBOR in New York. Obviously the co-conspirators know that Citibank is suppressing LIBOR in New York. And obviously Barclays knows that itself and their employees are manipulating LIBOR in New York. And so you have knowledge, you're both agency and you have knowledge. Okay. I understand the argument. And the last question for me on this is, is there any New York appellate authority that endorses as broad a view as you just articulated and as the Southern District said in the terrorist case? Your Honor, nothing comes to mind. I wouldn't say no. Nothing comes to mind. The terrorist case has been cited by both plaintiff and defendants in this action. We didn't see anything that indicated it was flouting or expanding New York law. And the New York law in the statute itself speaks for itself. It says one commits a torturous act or his agent, Judge Friendly, has made clear that a co-conspirator is an agent to another. I don't understand the argument here. I mean, we have appellate division cases, right? There's an appellate division case, American Broadcasting v. Herbright. Doesn't it say that a co-conspirator is an agent of another co-conspirator and that one commits acts pursuant to a conspiracy in New York? Yes, yes. There's jurisdiction, right? So is that not unfair? No, that certainly wouldn't be applicable. That's correct. And we can see, though, if direction or control was required, there are no allegations that would satisfy that standard, right? If direction or control were required, there are no allegations that would satisfy that, right? Well, you'd have as to each conspirator itself, you'd have the… No, no, but you would have that one conspirator directing or controlling another. Right. That's certainly not alleged, right? Right. The stronger allegations are with respect to the knowledge of and agency. As respect to whether a co-conspirator in LIBOR controlled another co-conspirator, there aren't allegations except that they controlled their own actions. As far as the other conspirators, that's not the case. Okay. And just on the waiver, I have only one question, because what you cite in the reply brief strikes me as something that looks like a waiver. It says, we're not going to bother with this kind of argument because we think it's enough to rely on this other kind of argument. But I did find in a brief in support of a motion to dismiss in July 2016 the defendants saying that conspiracy jurisdiction would be inconsistent with various long-arm statutes, and then there's a response by the plaintiffs which says, well, this misunderstands New York long-arm. The district court never reaches that issue. The district court doesn't reach it. If there's one note in one brief about a long-arm statute, we don't consider that to be really raising the argument. You have a significant briefing in this case on multiple occasions, and an argument needs to be raised and fleshed out with citations of case law. Okay. But you know what I'm referring to when you're saying that's just not enough to  That's not enough to preserve an argument. I understand. I think, as you know, there's another appeal pending before another panel. Yes. Is there any factual or legal distinctions between that appeal and this one? I mean, the only distinction would be the statute of limitations. You have Puerto Rico law and its precedent. No, but on the personal jurisdiction? On personal jurisdiction, no, there shouldn't be. I mean, no, they're very much similar, and the arguments to one likely will impact the others. One difference would be that in the pending case, the argument, because it's an antitrust claim, is that the contacts have to be with the United States generally. But it seems to me that the contacts that are actually relied on to show contacts with the United States are mostly in New York. That's correct, which goes to also the Calder test and whether or not they were targeting New York. Judge Buchwald, in her decisions in the Libar case, said defendants expected the lenders in New York to have an impact. They intended the lenders in New York to rely on these rates. They were the intended recipients or the intended victims, as it were, of said fraud. And so— Because they're being affected in New York, you're saying? Because of the effects? Oh, sure. Under the Calder test, I mean, clearly— I mean, whenever there's any kind of conspiracy involving big banking institutions, wouldn't there always be an effect in New York? Oh, that is correct, Your Honor. So is that basically any conspiracy between banking institutions would end up being— If it's a conspiracy between banking institutions in Hong Kong that don't have a nexus to New York, that aren't relying on the New York capital markets, no. But the point here is you are dealing with the largest banks who are targeting New York, who are targeting discussions with the New York Fed, who are discussing in their emails the impact on the LIBOR submissions on the rates of mortgages in New York. Clearly, there's a New York nexus. It can't be that the argument is this fraud is too large for it to be directed anywhere. Does it matter if the emails were sent in New York? I mean, if those individuals had been traveling and sent them from other locations, would it not be in New York? Or is it the fact that the effect is in New York or those people are based in New York? Both actions within New York, that's one level. And then also the fact that the effects of the fraud were intended, directed, and were felt in New York. So those are the various levels. But didn't we reject that in Schwab? The argument was similar to California and Schwab. Absolutely not, because in Schwab it was rejected. The simple sale of LIBOR products was insufficient because those were not in furtherance of the fraud. They were in furtherance of the manipulation. Here, the actual manipulations are conducted and are held in New York. You have a bargain. But that's a different argument than that they knew the effects would be in New York, right? Sure. But also when you're dealing with where the fraud was dealing with convincing the Fed, Federal Reserve of New York, that there is no fraud, when there's discussions about whether or not, whether the mortgage rate resetting in New York, those are effects, particularly in New York, particularly. And this court in the Christian music case, MP3 tunes, said that just because the fraud is so vast doesn't mean that it's not directed at a particular forum. It actually means it's directed at all those forums. But we're not really saying that here because when you're dealing with financial fraud of this nation of LIBOR, it is New York. If you don't hit, if this fraud doesn't hit the New York capital markets, the fraud is going to have no impact whatsoever. All right. I think your time is up, but you reserve three minutes. Thank you.  Thank you. We'll now hear from Mr. Mazzina. Thank you. May it please the Court. Paul Mazzina for the FLEs. Judge Lynch, you asked about this case versus the Schwab appeal. I think the personal jurisdiction arguments here are considerably weaker than they were in Schwab. Unlike in Schwab, these plaintiffs have no transactional or other relationship with any defendant. And for that reason, the only claims they have are related to fraud in the LIBOR setting process itself, which is a fundamental fraud. Well, I'm not talking about my Schwab case. I'm thinking in terms of the case that I think Judge Bianco was referring to as a pending Schwab case that has not yet been decided. I was asking your adversary for purposes of exploring the New York aspect of this to assume in effect that that case is going to go against you on the constitutional issue. But I believe the issue in that case, whichever way it winds up going, is very close to the circumstances here. It's a very expansive theory about conspiracy jurisdiction bringing in defendants who are not the specific carriers out of acts in New York. Right. So, Your Honor, let me zero in on conspiracy jurisdiction then. And I recognize there's a pending case. And I'll take Your Honor's point that there may have been decisions reached in connection to that case. Well, but the problem is that case has not been decided. But we're going to be bound by which way it comes out, one way or the other. So it's, to me, a little bit less pressing to worry about the constitutional issue because I'm guessing that when that case comes down, probably, at best, whichever side loses that one will get an opportunity to brief whether that case controls this one. But it'll set the parameters. So I was just, for my own purposes, and I can't speak for my colleagues, focusing more on what is specific to this case, which is the New York statute. Understood, Your Honor. So with respect to the New York statute, first of all, I think you anticipated my response on waiver. I was going to cite page 1869 of the appendix. Yeah, that's the one I was referring to. Right. So, and Your Honor, we raised this, I think, at exactly the appropriate time. The New York long-arm statute argument became relevant in response to all of the new jurisdictional allegations that Plinkett's offered following the Gell-Bohm remand. So in the first round of personal jurisdiction briefing back in 2014 before Gell-Bohm, first of all, it was a very condensed briefing. It applied for a lot of action at the same time. And at that point, there was no reason to think that the differences between the New York long-arm statute and any standard under due process would be relevant. After the remand, Plinkett's, having gotten millions of pages of discovery from defendants, offered their supplemental jurisdictional facts, which are really the entire basis for Plinkett's arguments in this appeal. In response to those facts, that's when the long-arm statute became relevant, and we certainly briefed and argued it, both at the place I cited, and you look in the sealed appendix throughout defendants' responses to the particular jurisdictional allegations, one of the responses is often a lack of direction or control or knowledge. So I think that's clearly preserved. Your Honor, noted in Grove Press, this Court held that New York long-arm statute requires some degree of supervision or control, or at a minimum, knowledge. My friend said that knowledge is satisfied here. Respectfully, I don't think that's even alleged. A lot of these contacts, and I'm happy to talk about any particular contacts the Court is interested in, but many of them are really of the nature of sort of one-offs if you think that they relate to the conspiracy at all, and frankly, I think that they don't. What about the allegation that every panel bank transmitted their daily collusive submissions to Thomson Reuters in New York? Why isn't that sufficient contact? Let me say a few things about that, Your Honor. First of all, what Your Honor just said is actually not alleged. The allegation they're talking about is at page 124 of the sealed appendix, and it's not alleged that all banks transmitted to New York. In fact, it's not even alleged that Rabobank did. What the allegation says is this one particular former Rabobank trader, now a Libor submitter, stated that he understood that Rabobank submissions were transmitted to New York. That's the entire allegation, and I frankly don't think plaintiffs could have alleged in good faith that all of the banks did because they got discovery in response to a subpoena from Thomson Reuters, so they know that's not the case. Even as to that allegation, the documents on which plaintiffs rely, which are incorporated by reference in their complaint, refute that that trader refute his statement. So it's clear from the statement itself that he didn't have personal knowledge of the submission process, and the charging documents— But you understand that there were all of these intrabank communications about lowering the Libor rate, right? All of these emails that were sent to New York? So, Your Honor, you may be referring to some of the J.P. Morgan emails, and I'm happy to talk about those. And I really think—I would urge the court to read the documents themselves. Yeah, right, the J.P. Morgan emails, right. So I guess you draw a distinction between intrabank and intrabank communications, right? But does that make a lot of sense? So if, in fact, we think that there is a conspiracy and the banks agreed to lower the Libor together, then an intrabank communication that says we should go and submit a lower bid or a lower bid might be an overacting furtherance of the conspiracy. Your Honor, I think more important than the interbank or intrabank nature of the communication is the fact that none of these communications actually indicate anyone in New York directing or ordering the submitters abroad to submit an artificially low Libor. And it really is important to take a look at these. You know, just for example, one of the communications— But the question is, is it plausible? I understand. You might say, well, OK, they're just saying we think that the Libor is too high and you should revise it down because that would be more accurate, right? You might say it doesn't reflect culpable conduct. But at this stage in the proceedings, if we're giving all sorts of inferences, if, in fact, we think that there is a conspiracy and we're deciding whether there was an act in furtherance of the conspiracy in New York under the allegations, why is it plausible that if somebody is saying we should submit lower bids, that that's part of—that's in furtherance of the conspiracy to submit lower bids? So respectfully, I think that gives plaintiffs too much leeway even at the pleading stage. This Court has said plaintiffs don't get the benefit, first of all, of argumentative inferences from the facts. And they have to allege a vermince of fact that if credited by a jury, would support personal jurisdiction. So the question is, could a jury based on these emails conclude that individuals in New York were actually directing the Libor suppression abroad?  Why would it have to be that the New York participants are directing the conspiracy? If everybody understands that this is the way we're going to do things, and somebody in New York makes a suggestion that fits into that pattern, why isn't that an overt act in furtherance of the conspiracy? In other words, it doesn't have to be the New York guy is saying, today, do this, because that will further the conspiracy. If everyone understands that there is a general practice of colluding in this way, or doing things for the benefit of the private benefit of your institution, then why aren't any of these suggestions plausibly inferred to be in furtherance of that scheme? So, Your Honor, I think it might help if I could talk about some specific emails, because I think that many of the characterizations are frankly not true to the context. I know you think that, but we've been through this in Gelboim. We've been through this in Schwab 1. A panel is going through this in Schwab 2. It's not like we don't know what's in those emails. And this court has repeatedly rejected Judge Buchwald's reasoning, which I think is basically yours, and said there is enough here, in these emails, in these allegations, to warrant an inference of a conspiracy. And once you have that inference of the conspiracy, I guess I have the same question as Judge Maggio. Why isn't anything that could plausibly be read as coming out of New York as, hey, submit a lower bid this week, this day, this hour, why wouldn't it be plausible to infer that that's part of this whole project? Well, so just to the type of email Your Honor just referenced, I think it's important to distinguish between the trader-based allegations, which really have nothing to do with the allegation of persistent suppression. If, for example, you have an email from a trader saying, I need low LIBORs on Thursday to help my trades, that's inconsistent and frankly antithetical to the whole idea that there is an agreement to suppress LIBOR every day throughout the class period. What about the Barclays executive allegation that he instructed, that the instruction went to the head of the money market desk to reduce LIBOR submissions? What about that one? I'm sorry, Your Honor, I'm not sure which allegation you're referring to. Barclays executive, Jerry Del Misur, based in New York. So this is, the allegation is sealed appendix page 125, and it's based on an article in the Guardian newspaper. And what that Barclays employee says in the article is not that the directive came from him, but that it came from the CEO in London and indirectly from the Bank of England. And he says he passed it on. So the directive originates abroad, it ends up abroad. Is the fact that it passed through an employee sort of in transit in New York sufficient? Courts in this circuit have held pretty consistently, I think, that an email passing through a server in New York is not sufficient. No, no, no, this is not a server. This is not, I send an email to the guy down the hall in London, and because of the vagaries of the internet, it sort of wanders all over the world before it lands on his desk. This is a question of conspirator A in London tells conspirator B in New York what to do, and conspirator B passes that back to another agent of the conspiracy somewhere else. I mean, if these were drug dealers, we wouldn't have any problem saying that the guy in, the middle man in this transmission is not just the equivalent of a server, a robot, an automaton, a machine. This is somebody who has to make a decision. Am I playing or am I not playing? Am I doing what my boss tells me or am I not doing it? He's an agent, not in the principal agent sense necessarily. I'm saying he's a moral agent. He makes a decision to participate by passing the order on. I don't see why that isn't classic conspiratorial behavior. Your Honor, I recognize my red light. If I can respond, I'd like to make two points in response. To me, Your Honor, it seems like you are. If you think that's conspiratorial behavior, I think there are two further questions you have to ask. First of all, if this is an over-adapted informing in furtherance of the conspiracy, that's sort of the first point. Then you have to ask, does it create the kind of strong, substantial connection between the forum and the defendant and the claims the Supreme Court has said is required? So the Supreme Court has said over and over, sort of isolated, random, fortuitous contacts are not sufficient. You need this strong connection. If this conspiracy that is allegedly and I think admittedly centered abroad, the fact that this instruction passed through the executive in New York, I don't think that creates a kind of strong connection. Just go back to what you answered to me a moment ago. So if somebody from New York sent an email and said – and gave an instruction to submit a lower LIBOR rate, you'd say that that would be sufficient, right? If it was a directive, and I think not just to submit a lower LIBOR rate but to submit an express LIBOR rate. So the decision between these emails and that hypothetical is instead of giving an express instruction, the emails say you think that the rate is too high and it would be better to err on the low side. Your Honor, I think that's phrased as like a suggestion as opposed to an instruction. That's what makes the difference? That is phrased as a suggestion that the employee making the suggestion provides his rationale in terms of objective factors and that the employee making the decision makes clear that it's ultimately his decision. Those same emails that Your Honor is referring to, the employee located abroad – That's just like a merits determination as to whether you can actually prove the conspiracy, right? Yes, but if for these purposes we're assuming that there is a conspiracy and the question is did one of the overt acts take place in New York, you could understand somebody making a suggestion as being tantamount to an instruction, couldn't you? Your Honor, I don't think these emails support that, but to the extent the court thinks they do, then you have to ask is it a sufficiently substantial connection, and if you think it is as to that defendant, the next question is is it fair and consistent with both New York law and due process to impute that to other defendants who didn't direct or control it and may not even have known about it. Judge Lynch, you mentioned drug conspiracy. I think it's worth noting in the criminal context where jurisdiction and venue rules are much more relaxed than in the civil context, this court doesn't even go that far to have venue in a district over co-conspirators based on an overt act. It has to have been foreseeable to all. Yes, foreseeable is an entirely different matter than the kind of things that you're talking about. You're talking about direction. You're talking about control. But if it's foreseeable by a member of the conspiracy that an overt act is going to take place somewhere else, certainly in the criminal context, that's good enough. It has to be foreseeable that a qualifying overt act will take place in the jurisdiction. Now, we do think the standard under due process in New York law is higher than that, but that is already a standard that I think plaintiffs would struggle to meet on these allegations. There are a lot of people serving long prison terms in this country in drug cases, in terrorism cases, in money laundering cases for nothing more than the kind of thing that you're saying doesn't matter, that somebody is a middleman in New York passing on instructions to somebody elsewhere. People get convicted for doing things like that, and they get convicted in the jurisdiction where they acted. And the other people involved in the conspiracy, if they're guilty, also get convicted in the venue where one of those acts took place. And I'm just trying to understand why this kind of misbehavior gets a different kind of jurisdictional pass. So a couple of points here. First of all, for reasons that I think are as much historical as theoretical, personal jurisdiction in the civil context has always been a much higher standard than in the criminal context. Why is it higher than the standard for imposing liability? I think that actually makes a lot of sense when you think about it. The question of who decides and what law are you going to be subject to is logically prior and in some ways more important than the ultimate question of are you liable under that law. But to circle back to the criminal standard, which I think, again, we think is not high enough for this context, but even under that standard, I don't know where plaintiffs have alleged, for example, that the other alleged co-conspirators located outside the United States knew or could have understood or foreseen that, for example, the Barclays director from the CEO would pass through an employee in New York on its way to a library seminar outside of the United States. All right. I think we have your argument. Thank you, Your Honor. Ms. Zina, thank you. Mr. Lieberman, you have three minutes in rebuttal. Thank you, Your Honor. I was going to focus a bit on the statute of limitations. The STAIR makes clear, this Court, that any statute of limitations of affirmative defense must be apparent from the four corners of the complaint. And we don't see anything or there's nothing alleged in the complaint that would arise to an effective affirmative defense against defendants or against plaintiffs. Excuse me. The standard in Puerto Rico is in Prieto v. Gallego and the Montesinos case is that— Excuse me. Is this rebutting something that was said in the argument on the other side? This is a continuation of the other argument in the case, which you didn't get to before. This is the statute of limitations, Your Honor. Yeah. So I take it that were the presider to agree, you would have no objection to allowing the other side to serve rebuttal to address new things that you're raising now that were not brought up in the argument that he had a chance to respond to. I wouldn't have a problem. I apologize. I just ran out of time last time around. So with respect to the statute of limitations, there is a legal framework to make these assessments in Puerto Rico. And first is that whether or not there's knowledge or sufficient knowledge to trigger inquiry notice is subjective. And it's very clear under the Puerto Rico statute and then also under the attending case law that there needs to be subject to knowledge to trigger any inquiry notice. So why don't you answer this question. So when the UBS filing came out, you knew who the defendants were going to be and what the claim was going to be, that it was going to be a libel or manipulation, right? Why didn't that put you on inquiry notice? Well, again, this is Government Development Bank of Puerto Rico, and there's no indication for the complaint that they knew about the UBS actions. That's to trigger the subjective knowledge that's required under Puerto Rico law. But how could they not? If they did know, would they have been on inquiry notice? And so is the argument only that you can't establish that they knew about it? Yes. First is that you can't establish that they knew about it. Would it have put them on some inquiry notice to do some due diligence if they knew about it, if it was alleged that they'd known about it? Likely. But then you have under Puerto Rico law the defendant reassurance exception, which is also recognized in the Second Circuit, which is that when defendants make assurances that temper any allegations of fraud, then all of a sudden the reasonable diligence requirement is held in abeyance. And that's where the district court made a reversible error. She said that despite these assurances, you didn't show that Puerto Rico did proper due diligence. Puerto Rico isn't required any longer to do due diligence once they are reasonably assured. And that's a critical error that the district court made. So that is a framework under Puerto Rico. First was their subjective notice. There's no allegation of complaint, but there is subjective notice. B, if you have subjective notice, if there's reasonable assurance, your duty of reasonable diligence falls by the wayside. You no longer have that duty. And it's apparent from the district court's order that they just, she misread, the district court misread the standard. Because she said, well, you may have had these reasonable assurances, but you didn't do due diligence. You didn't need to do due diligence. Because under Puerto Rico law, once you have reasonable assurance or defendant's assurance, then the obligation to do due diligence falls by the wayside. So what you're saying is simultaneously they weren't aware of the filing or the allegations, but they also got reasonable assurance? No. First of all, we're looking at the complaint status. We're going to look at the complaint. And looking at the complaint, there's nothing to indicate whether or not GDB had any knowledge of the LIBOR articles, the UBS action, et cetera. That's the first issue. But, I mean, you know, really, we can take judicial notice of what's going on in the world. And it strikes me as rather peculiar to take the position that it's not inherent in this situation, that reasonable bankers in a world in which everybody's suing all of these same defendants for LIBOR. I mean, the difference in dates here. In Schwab 1, we were talking about April 2011. Now we're talking about November 2011, right, as the relevant trigger date. So what's going on between April and November in 2011 is that people are filing lawsuits all over the place against LIBOR. And you're saying that reasonable bankers can't be assumed to be aware of this kind of development? I'm saying at the pleading stage? At the pleading stage, there's nothing under Puerto Rico law that allows for objective notice. It has to be a notice that is subjective. That is the first issue. You're saying that's enough at the pleading stage, which means that what is that going to be, the subject of a trial? Oh, that can be subjective. That can be subjective. Whether you can show that somebody actually read a newspaper article about the UBS filing or, like, it's in their e-mail or something. It can be the subject of deposition testimony. It can be the subject of discovery. And if it's clear that they knew or individually knew about it, that could be a motion for summary judgment. But then you get the reasonable assurance. Even if we get the inquiry notice, then you have the defendant's assurance doctrine, which says that all efforts to do due diligence are then no longer required. And these assurances that we're talking about, under Puerto Rican law, that would cover just general denials in the public press of the allegations in lawsuits? That counts as a reassurance as opposed to something that is specifically communicated to this particular plaintiff? Sure. If we're assuming that the reason why, first of all, taking the first step, the reason why they knew about the fraud was because they heard about it in the public sphere, then any public denial would similarly be accrued to them. So under Puerto Rican law, there is no inquiry notice when, not even inquiry notice, when a plaintiff is aware of widespread allegations that the plaintiff has been defrauded, which the defendants in those lawsuits have simply denied in a press release. No. Assuming their inquiry notice is triggered, then they would be deemed to, if we say subjective, and that's what the case law says is subjective, if they had known about those press releases, then the defendants' assurances, if it's reasonable for them to rely upon them, then that would then stay or hold by the wayside any duty to do any further due diligence. That is under Puerto Rican law. And so, therefore, if it was reasonable for them to rely on these assurances, then they wouldn't, then there would be no, there would be no I would have thought that you would make the argument that we said in Schwab that this UBS filing didn't seem to be enough to put plaintiffs on notice of their claims. Oh, precisely. We're saying we don't even get there. We don't even get there under Puerto Rican law. But even if we got there, if we had inquiry notice, and that they actually knew about it subjectively, knew about these articles. So you do have an argument that even if this works in a more traditional way as a statute of limitations and you did know about it, you wouldn't think that it would? Of course. Schwab is on record. If the score were to hold BPP in Schwab, there would be no means to, we don't think, to dismiss the lawsuit. All right. Nothing happened between April and November of 2011 to change that? No. There would be nothing to change at all. There's nothing on the record. Nothing in the complaint. There's more lawsuits. Nothing in the complaint. The lawsuits are, nothing changed in those lawsuits. Whether there are a few more lawsuits, it's certainly not alleged to complain. It's certainly not, and nothing alleged by defendants, and the court is bound by the complaint. All right. Thank you, Mr. Warren. Thank you. Thank you, Mr. Mazzina. We'll reserve decision.